**UNITED STATES, Appellee**

v.

**John W. PROCTOR, Jr., Staff Sergeant U.S. Air Force, Appellant.**

No. 67,860.

CMR No. 27931.

U.S. Court of Military Appeals.

Argued Jan. 6, 1993.

Decided Aug. 18, 1993.

For Appellant: *Captain Robert I. Smith* (argued); *Major Mary C. Yastishock* (on brief); *Colonel Jeffrey R. Owens, Colonel Terry J. Woodhouse, Major Alice M. Kottmyer.*

For Appellee: *Captain Jane M.E. Peterson* (argued); *Colonel Richard L. Purdon* and *Lieutenant Colonel Jeffery T. Infelise* (on brief); *Lieutenant Colonel Brenda J. Hollis.*

*Opinion of the Court*

GIERKE, Judge:

A military judge sitting as a general court-martial convicted appellant, contrary to his pleas, of multiple sexual offenses and assaults on children under 16 years of age, in violation of Articles 134 and 128, Uniform Code of Military Justice, 10 USC §§ 934 and 928, respectively. The approved sentence provides for a dishonorable discharge, confinement for 30 years, total forfeitures, and reduction to E–1. The Court of Military Review affirmed the findings and sentence. 34 MJ 549 (1992). This Court granted review of the following issue:

WHETHER THE MILITARY JUDGE ERRED WHEN HE FOUND APPELLANT HAD SUFFICIENT MENTAL CAPACITY TO CONDUCT OR COOPERATE INTELLIGENTLY IN THE DEFENSE OF HIS CASE.

Appellant raised the question of his mental capacity at trial and before the Court of Military Review. The military judge found that appellant had sufficient mental capacity to stand trial, and the Court of Military Review affirmed the findings and sentence. We hold that the military judge did not err.

I. Factual Background

Between June 1981 and April 1986, appellant was seen in several Air Force mental health clinics for unspecified reasons.

Because his command was concerned about his mental suitability for a security clearance, appellant was sent to the mental health clinic at Kadena Air Base on October 22, 1987. At that time Major Geeze, a psychiatrist, diagnosed appellant as narcissistic with suggestions of delusional thinking. Major Geeze treated appellant until August 1988, at which time Major Geeze determined that there were no psychiatric "contraindications" to returning appellant's security clearance. On November 16, 1988, appellant was admitted to the Kadena mental health clinic after "contemplating suicide" because of the investigation of the offenses involved in this case. On November 21, 1988, appellant was placed in pretrial confinement.

At the request of appellant's first detailed defense counsel, Captain Coning, a sanity board was convened, consisting of Major Geeze, a psychologist, and another psychiatrist. On December 13, 1988, the board diagnosed appellant as a pedophile with a narcissistic personality disorder but found him mentally responsible and competent to stand trial.

On January 5, 1989, appellant relieved Captain Coning. Lieutenant Colonel Brown was detailed in Coning's place, and he requested another sanity board. On March 10, 1989, the second sanity board diagnosed appellant as a pedophile suffering from an unspecified personality disorder but found him mentally responsible and competent to stand trial.

Prior to trial appellant rejected a pretrial agreement limiting confinement to 15 years, telling his counsel that God would deliver him from sentencing.

At trial, the military judge had extensive dialogue with appellant on the question of his mental capacity as well as other interlocutory matters. Early in the trial, there had been considerable discussion about whether Captain Tressler, assistant defense counsel, could testify on appellant's behalf without breaching the attorney-client privilege. Appellant requested that Captain Tressler be excused, and requested permission to explain his reasons.

After reading a passage from the Bible, appellant stated:

When I left here yesterday afternoon I had no idea at all what was going on. I was 98 percent in the lost. And I think the only person in the courtroom that knew less about what was going on in this court-martial was the bailiff. There was a lot of things said, but it was quite confusing. I went back to the Joint Forces Brig last night and I prayed on it, and this morning about 3:00 A.M. I awakened and started meditating, as I do every morning, and God explained it all to me.

There are several agendas here, Your Honor.

The prosecutor has an agenda. The Prosecutor's agenda is to convince the Court that I don't believe that God talks to me and that I am competent to stand trial. On the competency part, I agree with the Prosecutor. I am competent. I have passed two Air Force Sanity Boards to prove that I am competent.

My attorney has an agenda. Because I disagree with him on several issues, he believes that I'm incompetent. But he also believes that I believe that I talk to God and that God talks with me.

Your Honor, You have an agenda. And your agenda remains the same throughout the entire proceeding, and that is for justice.

And then the most important agenda, the Lord's agenda. His agenda, and I am representing him on this, is that people understand that God does work in the lives of men and women today as much as he ever has in the past. That is the reason that we are here, regardless of what anyone else thinks is the reason.

Captain Tressler has been assigned as my Attorney so that she could handle the sentencing part. I know that God has told me that there is not going to be any sentence, that he is going to deliver me. Therefore, Captain Tressler is no longer necessary.

\* \* \*

One of the things that kept flying back and forth yesterday was whether or not there was a waiver. I know that there is a waiver; my attorney knows that there is a waiver; I am quite sure that the Prosecutor knows that there is a waiver; and everyone in the court knows that this waiver exists; that I have signed this waiver.

\*     \*     \*

But the real reason I signed the waiver is because anything that I have already told Captain Tressler, I am willing to tell this Court. So, therefore, there is no need to hide the fact that there is this waiver. If my Attorney later feels that it is necessary for Captain Tressler to testify, when he feels that it is necessary for her to testify then she is still free to testify because the waiver exists. Therefore, all the time that we spent yesterday discussing whether or not Captain Tressler should testify first or last or somewhere in between, we did not have to have that time. She can be dismissed, and testify and be out of the courtroom and not be influenced by the other witnesses. Therefore, I am dismissing her on those grounds.

Appellant next told the military judge what he thought about the defense request to close the hearing on mental capacity:

The Prosecutor has an agenda pertaining to this. His agenda is that the public has a right to know. And I agree with that. The public has a right to know. For a different reason, though. The Court would have to uphold his wishes that the public has a right to know because of the First Amendment. Now, with this right to know, though, and this is the reason prosecutors like to have information released, regardless of how many restraining orders you give the panel members, they read information. They hear information on the television, and they discuss it. That is not going to be stopped. But that's not my reason for agreeing with the Prosecutor. That's my Attorney's reason for not wanting to have an open hearing. My reason is the Lord's agenda. God has told me specifically that he is going to deliver me from this. He has given me a ministry that is going to be a national ministry. Nothing could be better than to have people understand beforehand that this is going to take place. Therefore, I agree with the Prosecutor that all of the information that happens during this hearing be released to the press and be available to anyone who wants it. So that when I am delivered people will know that it is going to take place prior to.

Also, Your Honor, so that fairness in this event takes place, any information that the Prosecutor or the Court would release, I would also request that I be allowed to talk to reporters about the Lord's agenda in this case; and I would insist on doing so.

After appellant concluded his narrative, the military judge questioned him further regarding the relief of Captain Tressler. The military judge asked if appellant believed he did not need Captain Tressler because he believed there would be no sentencing, and appellant responded, "I know that we will not need her services."

When the military judge explained the increased burden on the remaining defense counsel, appellant responded that Colonel Brown was "the second attorney on my case." Appellant explained: "Jesus is my first attorney. He tells me what to do. Colonel Brown is my second attorney in this case; and, therefore, he is all that is required."

On the issue of mental capacity, appellant testified that he became a minister in the Greater Mountain Eagle Missionary Baptist Church in Dayton, Ohio, a fundamentalist church believing in a literal interpretation of the Bible, when he was 17 years old. Appellant testified that God speaks to him frequently, but that God has given him permission to talk about it only with certain people. Appellant testified that after he was placed in pretrial confinement, his faith grew substantially because of a series of miracles. These miracles began when appellant's clothing, except for

his underwear, was taken from him because he was a suicide risk. Appellant testified that he asked God to return his clothes, and they were returned. When there was no hot water in the showers, God told appellant to wash his hair every morning. Appellant complied and had hot water when no one else did. Lastly, God confirmed his presence by allowing appellant to see stars at night despite the bright lights of the compound. These miracles convinced appellant that God wanted him to plead not guilty to show people that he would be freed from sentencing by the power of his faith, and that after receiving God's deliverance, appellant would establish a corporation, Faith Unlimited, to preach the message of faith.

The military judge questioned appellant about the timing of his deliverance, resulting in the following colloquy:

Q. Sergeant Proctor, what is your understanding of what God's will is supposed to be insofar as how this case will end and your delivery?

A. Your Honor, I have tried in the past and God has scolded me because of trying to determine when He is going to do what He has said He is going to do. I know that at the end of everything, one way or another, God is going to deliver me. That is all I know. The when or the how, I don't know.

Q. You say at the end of everything. Does that mean to you at the immediate end or at some time into the future?

A. I believe that it is going to be very shortly.

Q. Could he require patience on your part?

A. That is the first thing He taught me, to be patient. I believe also that even after your part, my part, our part here is concluded, that there is probably going to be some type of treatment to insure also that I will not be involved in that same type of sin again. And that might require patience.

After appellant insisted on calling witnesses to his faith, contrary to the advice of his defense counsel, appellant explained:

Your Honor, the issue of capacity is based on whether or not I really talk to God and God talks to me or whether he doesn't. That is what the issue is about. And if I am not the only person who knows that God talks to them, I think it is very important that the Court understands this. And that is what these witnesses are about.

My attorney's previous position was that I was not following his advice, therefore, I was not competent. Of course, my position has been I was not following his advice because God is telling me what I should do. Now if I am not the only person who God tells what to do and they do it, then evidently I am competent. And, therefore, God's promise to me to deliver me is going to be on its merits not based strictly on my opinion of what I think God has said.

Following testimony by Major Geeze and before the military judge ruled on the question of appellant's mental capacity, appellant asked to be excused from further attendance at the trial. Appellant read a long passage from the Bible and accused the military judge of not taking the issue seriously. The military judge then denied appellant's request to be excused from further attendance at the trial.

The military judge then denied the defense motion to dismiss the charges or continue the case indefinitely based on lack of mental capacity. He made the following findings of fact and conclusions of law:

The Court bases this decision on the testimony and exhibits presented at trial as well as the observations of the accused during approximately four days of trial, except for his selection of counsel during the initial 39(a) Session which pursuant to the Defense request the Court agreed not to consider. The Court has reached its own decision independent of the opinions of the expert witnesses appearing at trial.

\* \* \*

The Court finds that a Delusional Psychosis has not been established by a preponderance of the evidence.

A Personality Disorder has been established, predominantly Narcissistic in nature. The Court does not believe this constitutes, as described in detail during the proceedings, a mental disease or defect. However, because the Court believes that Personality Disorders may qualify technically as mental diseases or defects, the case law being unclear on this issue due to the changes in mental responsibility standards over the past several years, the Court will nonetheless consider it to be a mental defect or disease.

\*     \*     \*

The real issue before the Court is whether the accused is able to conduct or cooperate intelligently in the defense of the case. The Court finds that he has the capacity to do so.

The Court finds that the accused can assist in accounts of the facts, identities of witnesses, and similar matters. That he has coherency of ideas and control of his mental faculties, as well as the requisite power of memory to allow him to testify in his own behalf, if he desires. The accused has at least average intelligence and is able to express himself quite well.

The Defense urges that the accused suffers from a Delusional Disorder which makes it impossible for him to meet this third prong of the mental capacity test. This is based upon the accused's statements that God speaks to him, that God directs his life, and essentially that God is going to deliver the accused from jail.... The accused believes that God has forgiven him for his sins and that God will deliver the accused as a sign so that the accused can start "Faith Unlimited" to begin teaching about faith in God.

There have been many interpretations of when God would deliver the accused: whether it would be before sentencing, after sentencing, before jail, or after some incarceration. The accused has acknowledged at times that he may have to spend some time in jail, that God has not yet filled in the block regarding his deliverance and that he may need to have some patience.

The accused has acknowledged that he has free will or freedom of choice regarding his decisions, but that he will follow what God directs in order not to sin. The Court finds that the accused understands the decisions are his own to make. Indeed, the accused has indicated that in the past he has violated God's will. As well, the accused has indicated that at times he must seek God's guidance to make sure that what he thought was coming from God was indeed coming from God.

Dr. Piciucco believes the accused has a Delusional Disorder, Psychotic, without any regard to the accused's sociocultural group or his religious background. Dr. Geeze and Dr. Ram believe the accused is not suffering from a Delusional Disorder.

After considering all the evidence, not just the expert witnesses, the Court concludes the Defense has not established by a preponderance of the evidence that the accused is suffering from a Psychotic Delusional Order or a lesser Delusional Disorder rendering the accused unable to conduct or cooperate intelligently in the defense of the case.

After several intervening rulings by the military judge on defense motions, appellant requested to excuse his counsel and defend himself *pro se.* After a lengthy inquiry, the military judge granted his request.

The court-martial recessed overnight after all pretrial motions were litigated. When the court-martial was called to order on the morning of April 4, appellant was absent. He refused to return voluntarily and was carried into the courtroom. He refused to respond to questions from the military judge, attempted to leave the courtroom, and was physically restrained from doing so.

After a one-hour recess appellant was returned to the courtroom wearing hand and leg restraints. The military judge di-

rected that the leg restraints be removed and then asked appellant if he was ready to proceed with the trial. Appellant responded, "Your Honor, I request that you go ahead and give me the maximum so that we can end this." The military judge explained that it was not possible to proceed immediately to sentencing. Appellant then requested that Colonel Brown, the detailed defense counsel, resume his representation. Appellant persisted in his request to be excused from attendance, and the military judge arranged to have appellant sit in an adjoining room and participate in the trial by using closed circuit television.

After findings were announced, appellant returned to the courtroom to make a sworn statement during the sentencing proceedings. He testified in part as follows:

The first and most important thing that I'm going to say here is that I'm a Christian and that's important because of the things that I've done. Because I believe that if I as a Christian could have done the things that I've been found guilty of and the things that it's known that I've done, then anyone could do these type of things. And it is a sickness.

A few minutes ago before I came up here, the Judge for I don't know how many times now, has briefed me on my rights. On 9 November 1988, I called my commander who was not only my commander, but my friend, that evening and I asked him to come to my house and place me under arrest. And at that time I said to him, quote, "Sir, I'm a sexual child abuser." unquote. And at that time and every day almost since then everyone has been telling me about my rights. I don't have any rights.

\* \* \*

I don't have any rights because I hurt those kids. I lost my rights when I did that. Not only did I hurt the kids, I hurt their parents, because a lot of the parents had a lot of trust in me. And out of all the kids that testified there was only one child who I did not know the parent.

And not only the parents, but this whole community.

\* \* \*

I wanted to take an oath, ma'am, because you said at this point you'd be very suspicious of any statements that are given. So if I took the oath I'd answer any questions. I don't need Article 31, because I don't have any rights. I've lost my rights. These kids have all the rights.

I apologize to them, to their parents, to the community, and to the Air Force.

On cross-examination, appellant was asked whether he thought he would abuse children again if he were "let out of jail." Appellant responded:

I don't want to be let out of jail right now. If I'm not going to get help, I don't ever want to get out of jail. And you don't have to believe me, but it's the truth. I told Doctor Geeze that when he did my first sanity board.

Before the Court of Military Review, appellant again raised the issue of mental capacity. Because the Court of Military Review was concerned with "appellant's capacity to assist with his appellate review," that Court ordered a third sanity board in May 1990. That sanity "board concluded that appellant had no severe mental disease or defect and had sufficient mental capacity to understand the nature of both the trial and appellate proceedings." The board's diagnosis was: "pedophile, fixated type, factitious disorder with psychological symptoms." The board diagnosed appellant as "suffer[ing] from a significant personality disorder" which they believed "could account for his unusual belief that he is on a mission from God." *See* 34 MJ at 552–53 n. 1.

## II. Discussion

Appellate defense counsel now argue that appellant's delusion that he would not be sentenced made him mentally incapable of participating intelligently in his defense. The Government argues that appellant's religious beliefs are not a delusional disorder and that the military judge did not

abuse his discretion in finding appellant competent. *See generally Short v. Chambers*, 33 MJ 49, 52 (CMA 1991) ("military judge had both power and responsibility to determine whether accused was competent to stand trial").

RCM 909, Manual for Courts–Martial, United States, 1984, provides as follows:

(a) *In general.* No person may be brought to trial by court-martial if that person is presently suffering from a mental disease or defect rendering him or her mentally incompetent to the extent that he or she is unable to understand the nature of the proceedings against that person or to conduct or cooperate intelligently in the defense of the case.

\* \* \*

(b) *Presumption of capacity.* A person is presumed to have the capacity to stand trial unless the contrary is established.

(c) *Determination at trial.*

(1) *Nature of issue.* The mental capacity of the accused is an interlocutory question of fact.

\* \* \*

(2) *Standard.* Trial may proceed unless it is established by a preponderance of the evidence that the accused is presently suffering from a mental disease or defect rendering him or her mentally incompetent to the extent that he or she is unable to understand the nature of the proceedings against the accused or to conduct or cooperate intelligently in the defense of the case.

RCM 909 speaks in terms of a mental disease or defect; however, we noted in *United States v. Benedict*, 27 MJ 253, 259 (CMA 1988), that an accused need not be found to be suffering from a psychosis in order to assert an affirmative defense based on lack of mental responsibility, even though RCM 916(k) (Change 3) requires a finding of "a severe mental disease or defect." Although this case involves mental capacity rather than mental responsibility, the military judge gave appellant the bene-

fit of the same expansive definition of "mental disease or defect" in this case.

The phrase in RCM 909(c)(2)—"understand the nature of the proceedings ... or to conduct or cooperate intelligently in the defense of the case"—means that the accused "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and ... a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960). This Court has said that the accused

must be able to comprehend rightly his own status and condition in reference to such proceedings; that he must have such coherency of ideas, such control of his mental faculties, and such power of memory as will enable him to identify witnesses, testify in his own behalf, if he so desires, and otherwise properly and intelligently aid his counsel in making a rational defense....

*United States v. Williams*, 5 USCMA 197, 204, 17 CMR 197, 204 (1954).

■ Because mental competence to stand trial is a question of fact, RCM 909(c)(1), we will overturn the military judge's determination on appeal only if it is clearly erroneous. *See also United States v. Hayes*, 589 F.2d 811, 822 (5th Cir.), *cert. denied*, 444 U.S. 847, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979); *McFadden v. United States*, 814 F.2d 144, 146 (3d Cir.1987); *United States v. Lovelace*, 683 F.2d 248 (7th Cir.1982); *Chavez v. United States*, 656 F.2d 512 (9th Cir.1981); *United States v. Caldwell*, 543 F.2d 1333, 1349 (D.C.Cir. 1974), *cert. denied*, 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976).

### III. Conclusion

■ We conclude that the military judge's ruling regarding appellant's mental capacity is amply supported by the record. The military judge's personal evaluation of appellant was based on their numerous and lengthy discussions and supported by expert testimony. Appellant demonstrated throughout the trial that he understood the

nature of the proceedings. Notwithstanding his professed belief that God would deliver him from being sentenced, he recognized that his deliverance might not occur when he expected it. On one occasion appellant specifically asked the military judge to sentence him. Appellant participated meaningfully in the sentencing hearing, and he told the military judge he did not want to be released from confinement until he received treatment. After reviewing the entire record using the "clearly erroneous" standard, we hold that the military judge did not err.

The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judges COX, CRAWFORD, and WISS concur.