**UNITED STATES**

v.

**Senior Airman Angelo E. TAYLOR, Jr., United States Air Force.**

**ACM 35402.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 25 July 2002.

Decided 21 Nov. 2005.

Appellate Counsel for Appellant: Colonel Beverly B. Knott, Major Terry L. McElyea, and Captain Diane M. Paskey.

Appellate Counsel for the United States: Colonel LeEllen Coacher, Lieutenant Colonel Robert V. Combs, and Captain Stacey J. Vetter.

Before ORR, JOHNSON, and JACOBSON, Appellate Military Judges.

## OPINION OF THE COURT

JOHNSON, Judge:

Contrary to his pleas, the appellant was convicted of two specifications of attempted premeditated murder, and one specification each of desertion, failure to obey a lawful order, and assault consummated by a battery, in violation of Articles 80, 85, 92, and 128,[1] UCMJ, 10 U.S.C. §§ 880, 885, 892, 928. A military judge sitting alone sentenced the appellant to a dishonorable discharge, confinement for 27 years, forfeiture of all pay and allowances, and reduction to E–1. The appellant was credited with 269 days of pretrial confinement. The convening authority approved the sentence as adjudged. The appellant raises two errors for our consideration: (1) Whether the military judge committed prejudicial error by denying the defense's motion to suppress the appellant's wife's out-of-court statements which were testified to by a third party, thereby violating the spousal privilege and residual hearsay rules; and (2) Whether the military judge erred by denying the defense's sanity board request under Rule for Courts–Martial (R.C.M.) 706 and finding the appellant competent to stand trial. We find no prejudicial error and affirm.

---

1. The appellant was charged with assault with intent to commit murder under Article 134, UCMJ, 10 U.S.C. § 934. The military judge found him guilty of the lesser-included offense of assault consummated by a battery under Article 128, UCMJ. He was also charged with one specification of fleeing apprehension, in violation of Article 95, UCMJ, 10 U.S.C. § 895, but was acquitted of that offense.

*Background*

In May 2001, while on temporary duty in Curacao, the Netherlands Antilles, the appellant visited an off-limits brothel. The testimony at trial showed that after engaging in sexual activity with IR, a prostitute, the appellant argued with her. The argument escalated to physical violence. The appellant punched IR in her face with his fists, stepped on her throat with his foot, grabbed her hair, struck her head against the headboard, and grabbed her neck with both hands and choked her. Some time after the altercation, the appellant was injured by security guards from the brothel. There were cuts above his eyes and they were both swollen. His lip was cut open. There was blood on his head, a puncture wound on his leg, and his hand was injured.

Thereafter, the appellant left Curacao and returned to his home station, Dyess Air Force Base, Texas. In light of the pending investigation into the Curacao assault, the appellant was removed from his duties on the flight line and was tasked to perform details around the squadron. In the late August 2001 timeframe, the appellant requested a different detail because many of the people in his squadron knew he was under investigation. His first sergeant and supervisors considered his request and moved him to the Data Integrity Group (DIG).[2] On 24 October 2001, the appellant met with the first sergeant. She counseled him about some of his deficiencies that had been called to her attention. After the counseling session, she directed the appellant to go back to work. The appellant did not return to his place of duty, nor did he show up to work the next day. In light of the appellant's disappearance, on 25 October 2001, Master Sergeant (MSgt) Scott Goodnough, a security forces investigator, interviewed Airman First Class (A1C) Kimberly Taylor, the appellant's wife. The first sergeant had escorted A1C Taylor to the security forces building for questioning that day. A1C Taylor indicated the appellant had packed all his civilian clothes and left his military items behind. The interview lasted

approximately one half hour. MSgt Goodnough told her if she had any new information to come back and let him know.

On the following morning, A1C Taylor and her supervisor went to the security forces building to speak with MSgt Goodnough again. A1C Taylor appeared distraught. A1C Taylor informed him that the appellant had called her the previous night and that she had told him he was absent without leave (AWOL) and was going to be entered into a deserter status soon. She told him to be reasonable and encouraged him to turn himself in. MSgt Goodnough asked her whether the appellant had any weapons. A1C Taylor indicated that he might have some knives with him. This interview lasted approximately one hour.

On 30 October 2001, Air Force Office of Special Investigations (AFOSI) agents spotted the appellant driving a tan Ford Explorer with an adult male passenger leaving an off-base apartment complex parking lot. The agents, who were in an unmarked rental vehicle, a Jeep Cherokee, followed the appellant. One of the agents contacted the AFOSI detachment to report that they had located the appellant. Presumably because the agents were off the installation, one of the agents contacted the local authorities to assist them in apprehending the appellant. A high-speed chase subsequently ensued. One of the agents testified that the appellant recognized he was being followed. When the appellant made a left hand turn on a street, the agents momentarily lost visual contact with the appellant's vehicle. When they looked down the street in the opposite direction, they saw the appellant. The appellant had stopped and was standing outside his vehicle. According to the agent who was driving the Jeep, he saw a shiny object in the appellant's hand and then heard gunshots. The appellant had removed a .38 caliber revolver from his Explorer and aimed it at the Jeep driven by the AFOSI agent. Two of the bullets from the revolver hit the Jeep. The driver of the Jeep reversed the vehicle in an effort to remove himself and his part-

---

**2.** Personnel assigned to DIG are responsible for checking the accuracy of aircraft data that main-

tainers enter into the computer system.

ner from harm. Unfortunately, he lost control of the Jeep, which caused the vehicle to roll over. According to the passenger in the appellant's vehicle, when the appellant returned to the Explorer, he remarked, "I got them," gave the gun to the passenger and told him to "Reload it," and then drove off. Later that afternoon, a local police department detective found the appellant in his vehicle, with a self-inflicted gunshot wound to the face. Law enforcement personnel also found the revolver, the appellant's passport, approximately $400 in cash, and a checkbook in his vehicle.

### Suppression of Out–of–Court Statements

■ The appellant asserts that his wife's out-of-court statements to MSgt Goodnough, that the appellant was in an AWOL status, that he was going to be entered into a deserter status soon, and that he should be reasonable and turn himself in, should not have been admitted at trial. A1C Taylor asserted her spousal privilege and did not testify against her husband at trial. As a result, the prosecution offered A1C Taylor's statements through MSgt Goodnough. The trial defense counsel objected. The military judge found A1C Taylor's statements to be privileged communications, but held that she had waived the privilege when she voluntarily disclosed the communication to MSgt Goodnough. On appeal, the appellant alleges A1C Taylor's disclosure of the privileged communication was not voluntary because A1C Taylor felt compelled to divulge this information to the MSgt security investigator because of his rank and position. We find the statements made by A1C Taylor to her husband were confidential communications. *See United States v. McElhaney*, 54 M.J. 120, 131 (C.A.A.F.2000). We also find that A1C Taylor voluntarily disclosed the statements to MSgt Goodnough. After carefully reading A1C Taylor's sworn statement, it is apparent that she was fearful of the appellant. In her statement, she said the appellant told her that if he was caught and discovered who turned him in "he would make their life sorry and they would regret it." She said the appellant told her she was weak and that she told security forces personnel everything they wanted to hear. Finally, she said he told her he could have people watch-

ing her without her knowledge. Finding the disclosure of the confidential communication voluntary does not, however, end this inquiry. In light of the fairly recent Supreme Court case, *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), further analysis is required.

■ In *Crawford*, the defendant was charged with assault and attempted murder. The defendant's wife was also a potential suspect. At trial, the defendant claimed self-defense. His wife did not testify, relying on the state's marital privilege. The state offered the defendant's wife's out-of-court statements to police, that the stabbing was not in self-defense, under a hearsay exception. The statements were admitted and the defendant was convicted. The Washington Court of Appeals reversed. The Washington Supreme Court reinstated the conviction. The United States Supreme Court reversed and held that "[w]here testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.* at 68, 124 S.Ct. 1354. Not wanting to "spell out a comprehensive definition of 'testimonial,'" the Court held that it includes, at a minimum, "(a) prior testimony at a preliminary hearing, before a grand jury, or at former trial; and (b) police interrogations." *Id.*

Clearly, A1C Taylor's statements to the security forces investigator qualify as testimonial statements. MSgt Goodnough was investigating the desertion offense and had interviewed A1C Taylor the day prior about the appellant's whereabouts. At the end of that interview, he told her to let him know if she received any additional information. A1C Taylor complied with the investigator's request and provided additional inculpatory evidence the following day. A1C Taylor was deemed unavailable at trial; both parties agreed that she would refuse to testify against her husband. The remaining matter is whether there was a prior opportunity for cross-examination. Our review of the record indicates there was not. Under *Crawford*, A1C Taylor's out-of-court statements were inadmissible and therefore admitting the

statements into evidence was error. *Id.* at 36, 124 S.Ct. 1354. Having found an error of constitutional magnitude, we must now test for prejudice under the harmless beyond a reasonable doubt standard. *United States v. Kreutzer,* 61 M.J. 293, 298 (C.A.A.F.2005). To do so, we must determine "whether, beyond a reasonable doubt, the error did not contribute to the [appellant's] conviction or sentence." *Id.* (quoting *United States v. Davis,* 26 M.J. 445, 449 n. 4 (C.M.A.1988)).

■ We find the inadmissible evidence was not essential to convict the appellant of desertion. The appellant's first sergeant and supervisor testified that he left his place of duty on or about 24 October 2001, without proper authority, and did not return to work. The appellant was apprehended on or about 30 October 2001. There was an overwhelming amount of circumstantial evidence to prove the appellant's intent to remain away permanently. The appellant made obvious attempts to avoid apprehension by taking off in his vehicle when law enforcement officials were chasing him and also by shooting at them. Furthermore, when the appellant left his duty station he was already under investigation for other criminal charges. Lastly, when the law enforcement officials apprehended the appellant, they found his passport, $400 in cash, and a checkbook in his vehicle.

We need not speculate about the impact of MSgt Goodnough's testimony on the appellant's conviction or sentence because the military judge, on the record, stated he would have found the appellant guilty of the desertion charge had he not admitted the hearsay statements of the spouse.

We therefore find the error of admitting the wife's out-of-court statements to MSgt Goodnough was harmless beyond a reasonable doubt and that it did not contribute to the finding of guilty on the desertion charge. *See Kreutzer,* 61 M.J. at 298; *United States v. Hall,* 58 M.J. 90, 94 (C.A.A.F.2003).

*Sanity Board Request*

Next, the appellant avers he was not competent to stand trial for the sentencing por-

tion of the proceeding. After findings were announced, trial defense counsel requested a continuance for a second sanity board evaluation under R.C.M. 706.[3] Trial defense counsel asserted the appellant appeared to be fixated on the finding of guilty on the assault on the prostitute charge and was ambivalent about the remaining charges and the sentencing phase of trial. The military judge listened to counsel for both sides and also talked with the appellant at length. He then made the following findings of fact:

> [T]he accused understands the processes, understands the proceedings, is able to understand all the testimony, understands what his counsel is saying on a cognitive level, is able to communicate with them, but has an emotional fixation on the findings of the court as to Charge II. And because of his emotional fixation on that, he has chosen to remove himself from active participation and cooperating with the defense as far as presenting his sentencing case.... counsel does not understand how an accused would make that choice having as much at stake as he does. The accused conversely doesn't understand, I guess, why, from the legal point of view, the defense counsel don't share his emotional frustration at the findings.

The military judge ruled these findings of fact did not justify an inquiry under R.C.M. 706 and denied the defense's motion.

■ The standard for evaluating the competency of an accused to proceed to trial is whether or not the accused is able to understand the nature of the proceedings against him and to intelligently cooperate in his defense. *United States v. Barreto,* 57 M.J. 127, 130 (C.A.A.F.2002); R.C.M. 909. Whether an accused is mentally competent to stand trial is a question of fact that will only be disturbed if the military judge's determination was clearly erroneous. *Barreto,* 57 M.J. at 130 (citing *United States v. Proctor,* 37 M.J. 330, 336 (C.M.A.1993)). We have carefully read the record of trial, paying particular attention to the quality of answers

---

**3.** The first sanity board was convened on 7 March 2002. The appellant was found compe-    tent to stand trial.

from the appellant to questions posed to him from the military judge. The appellant was able to understand the nature of the proceedings against him and to intelligently cooperate in his defense. He simply *chose* not to actively participate or cooperate in the presentation of his sentencing case and therefore was not entitled to a second sanity board. We are convinced the military judge was correct in his analysis and decision. We find no error.

## Conclusion

The approved findings and sentence are correct in law and fact, and no error prejudicial to the substantial rights of the appellant occurred. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Reed,* 54 M.J. 37, 41 (C.A.A.F.2000). Accordingly, the findings and sentence are

AFFIRMED.