# UNITED STATES NAVY–MARINE CORPS
# COURT OF CRIMINAL APPEALS

————————————

### No. 201500423

————————————

### UNITED STATES OF AMERICA
Appellee

v.

### BENJAMIN D. LUNA
Staff Sergeant (E-6), U.S. Marine Corps
Appellant

————————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Lieutenant Colonel Elizabeth A. Harvey, USMC.
Convening Authority: Commanding General, Marine Corps Recruit
Depot/Western Recruiting Region, San Diego, California.
Staff Judge Advocate's Recommendation: Major Jeffrey V. Munoz,
USMC.
For Appellant: Frank J. Spinner, Esq.; Lieutenant Christopher C.
McMahon, JAGC, USN.
For Appellee: Captain Dale O. Harris, JAGC, USN; Lieutenant
Commander Jeremy R. Brooks, JAGC, USN; Lieutenant Jetti L.
Gibson, JAGC, USN; Lieutenant Robert J. Miller, JAGC, USN.

————————————

Decided 9 May 2017

————————————

Before CAMPBELL, RUGH, and HUTCHISON, *Appellate Military Judges*

————————————

**This opinion does not serve as binding precedent, but may be cited
as persuasive authority under NMCCA Rule of Practice and
Procedure 18.2.**

————————————

HUTCHISON, Judge:

A panel of members with enlisted representation, sitting as a general
court-martial, convicted the appellant, contrary to his pleas, of one
specification of rape, two specifications of sodomy, four specifications of

indecent acts upon a child, and one specification of indecent liberties with a child, in violation of Articles 120, 125, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920, 925, and 934. The members sentenced the appellant to 20 years' confinement and a dishonorable discharge. The convening authority approved the sentence as adjudged.

As his lone, original assignment of error, the appellant contends the evidence is legally and factually insufficient to support his convictions.[1] We specified an issue regarding whether the military judge erred in admitting propensity evidence in light of *United States v. Hills*, 75 M.J. 350 (C.A.A.F. 2016). We agree with the appellant that as to one Article 134, UCMJ, specification the evidence does not support a finding that the offense occurred "on divers occasions" and take corrective action in our decretal paragraph. Although we find error in the military judge's use of charged offenses as propensity evidence, we conclude the error was harmless beyond a reasonable doubt. Thus, following our corrective action, we conclude the findings and sentence are correct in law and fact and that no error materially prejudicial to the appellant's substantial rights remains. Arts. 59(a) and 66(c), UCMJ.

## I. BACKGROUND

In 1997 the appellant married Sally,[2] who had two children from a previous relationship, Veronica and Albert. Veronica was three years old when the appellant and her mother married. Between 2003 and 2004 the family moved to Camp Pendleton, California, where they lived in base housing. By December 2005, the appellant and Sally had two more daughters, Betty and Nancy.

Veronica testified at trial that the appellant sexually abused her in their Camp Pendleton home between March 2004 and March 2007, when she was between the ages of 11 and 13. Although her mother was never home while the abuse occurred, some of her siblings were. Betty testified that when she was about eight years old, she saw the appellant standing in his bedroom fully clothed with Veronica lying on the bed, naked from the waist down.[3] The abuse took many forms and continued until early 2007, when Veronica told

---

[1] In a supplemental summary assignment of error, the appellant argued the military judge erred in instructing the members regarding reasonable doubt. In accordance with the holding in *United States v. McClour,* 76 M.J. 23 (C.A.A.F. 2017), we summarily reject the supplemental assignment of error. *United States v. Clifton*, 35 M.J. 79, 81-82 (C.M.A. 1992).

[2] All names are pseudonyms.

[3] Albert, on the other hand, testified that the appellant was never alone with Veronica or Betty when his mother was not home, and the appellant never showered with him or any of his sisters. Record at 578.

her mother. That disclosure was precipitated by a severe spanking Veronica received from the appellant over wearing makeup. After the spanking, the appellant left the house to calm down. While he was gone, Sally came home and Veronica told her that the appellant had hit her with a belt and further disclosed that she had been molested.[4]

Upon the appellant's return home, Sally confronted him, kicked him out of the house, and telephonically reported the abuse to the appellant's father. The appellant drove to his father's house, approximately two hours away, and there the two men had a heated argument.

After a brief period where the appellant intermittently slept in his car, in his garage, and at a friend's house, he and Sally reconciled, remained married, and the family continued living together.[5] However, by November 2011, the marriage had soured. The appellant filed for divorce, and it became final in May 2012. Sally was awarded full custody of their children, but the appellant continued to see them and continued to participate in family events. The appellant was also present for the birth of Veronica's son, Jimmy, in March 2012. He walked Veronica down the aisle when she married in 2013 and attended Jimmy's first birthday party in March 2013.

In September 2013, the appellant had another child, Billy, with his new girlfriend, Misty, whom he had met in 2012. Sally learned of Misty and Billy through social media in December 2013, and subsequently reported the prior molestation of Veronica to NCIS in February 2014. At trial, Sally testified that she waited to file the report because she did not want to humiliate Veronica, she wanted her children to have a father, and she feared the family

---

[4] Sally testified that as early as late 2006, she sensed something was wrong with Veronica and that she twice asked Veronica whether anyone had ever touched her inappropriately. Each time Veronica denied it. Veronica testified she denied the abuse when asked because she was afraid she would get in trouble and lose her family.

[5] Testimony diverged on exactly how long the appellant remained away from the home following his confrontation with Sally. The appellant deployed in 2008 and the family moved to Pasadena, California to be closer to both the appellant's and Sally's families. Upon the appellant's return from deployment, he was selected for drill instructor duty which required him to go through drill instructor school and then work arduous hours at Marine Corps Recruit Depot (MCRD) San Diego. As a result, from 2009 until 2012, the appellant routinely stayed in quarters at MCRD during the week and would return to his family on the weekends or in between recruit training cycles. During that timeframe, the family moved to several different houses in and around Pasadena and Murrieta, California. While the appellant and Sally maintained a sexual relationship, filed joint taxes, and the appellant's name remained on the several leases for off-base housing, the nature of the appellant's work often kept him away from the family home for extended periods of time.

would lose their base housing. Veronica testified that she did not report the incident sooner because she was afraid her family would fall apart and did not believe the appellant would molest her sisters, as they were his biological children.

## II. DISCUSSION

### A. Factual and legal sufficiency

We review questions of legal and factual sufficiency *de novo*. Art. 66(c), UCMJ. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for legal sufficiency is "whether considering the evidence in the light most favorable to the prosecution, a reasonable fact finder could have found all the essential elements beyond a reasonable doubt." *United States v. Humphreys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (citations and internal quotation marks omitted). In weighing questions of legal sufficiency, the court is "bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses" we are "convinced of the accused's guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987).

The appellant claims the following facts render his conviction factually and legally insufficient: (1) the alleged molestation occurred over 10 years ago at a time when Veronica's memory was susceptible to manipulation, and her testimony was the "sole basis" for conviction; (2) Veronica continued to have a familial relationship with the appellant until 2013; and (3) the appellant denied molesting Veronica.

Despite the delay in reporting, we find Veronica's account of the sexual abuse credible, as she clearly described all of the charged offenses in definitive and compelling detail. Although there were instances where Veronica could not recall specific, ancillary details about the instances of abuse, her memory regarding the nature and quality of the appellant's actions that formed the basis of the charges was convincing.

Veronica provided detailed testimony about the appellant's penis penetrating her outer labia. She testified that she was at least partially naked, on her back, in her parents' bed. She further testified that she cried out in pain when the appellant penetrated her—at which time he stopped and said they would try again when she was older.

Veronica also testified that the appellant forced her to place his penis in her mouth in her parents' bedroom and shower. Notably, on one occasion, the appellant covered his penis in an edible lubricant and forced Veronica to

perform oral sex on him.[6] Veronica also testified that the appellant performed oral sex on her, explaining, "[h]e used to just lay me on the bed and then spread my legs and perform oral sex . . . . I remember watching him."[7]

Additionally, Veronica testified that the appellant, on numerous occasions, laid her on his bed in her underpants while he rubbed stretch mark lotion onto her thighs, moving his hands up her legs toward her vagina. She kept the lotion and gave it to NCIS during the course of the investigation.

Once, while walking through their laundry room, the appellant asked Veronica whether she had ever kissed a boy. "[The appellant] picked [her] up and put [her] on the washer and told [her] that he was going to show [her] how."[8] The appellant then began kissing her with his tongue. When the trial counsel (TC) asked whether "this happened more than once," Veronica responded: "That time, specifically, is what I remember."[9] The TC did not follow up with another question related to the appellant kissing Veronica, and no other testimony or evidence was introduced that would indicate the appellant kissed Veronica at any other time. Consequently, we are left with doubt that the appellant kissed Veronica on the mouth with his tongue on more than one occasion. Accordingly, we will affirm only so much of the finding of guilty to that specification that does not include the words "on divers occasions."

Veronica also testified that the appellant showed her his penis in her parents' bathroom and "then [the appellant] . . . tr[ied] to get [her] to . . . jack him off . . . telling [her] that the faster that [she] move[s] it, it makes you cum."[10] She testified that she saw him ejaculate into the bathroom sink. She further testified that on many other occasions the appellant showed her his penis but did not masturbate. Finally, Veronica testified that, on several occasions, the appellant forced her to touch his penis and rubbed his penis on her vagina and inner thighs while in her parents' bed and in their shower.

Contrary to the appellant's assertions, Veronica's testimony, while convincing, was not the sole basis for the convictions. Sally testified that after she became aware of the abuse in 2007, she took various measures in an attempt to prevent its continuance, including asking the appellant to leave their home. Betty, the appellant's biological daughter, who admitted to

---

[6] Record at 451.

[7] *Id.*

[8] *Id.* at 446.

[9] *Id.* at 447.

[10] *Id.*

feeling closer to the appellant than to Sally, testified that she saw Veronica naked from the waist down, alone in the appellant's bedroom with the appellant.

Additionally, the appellant's father testified that the appellant came to his home after Sally told the appellant's father that the appellant had been sexually abusing Veronica, and admitted to having made a mistake and apologized.[11] The appellant also sent Sally a series of incriminating text messages during their divorce, telling her, "[y]ou'll be served, you'll cry and get mad, tell your counselor about the past, I'll go to jail, that's the last I will ever see you and my daughters."[12] In another text to Sally, the appellant said, "[y]ou had no problem having me sleep in my car because its [sic] fine that's what I deserved."[13]

Moreover, nothing at trial revealed a credible motive to fabricate for either Veronica or Sally. While Sally and the appellant had a contentious divorce, there is no evidence the divorce motivated Sally or Veronica to report the molestation. In fact, the appellant and Sally testified that they maintained a cordial, familial relationship during and after the divorce. Indeed, the appellant and Sally maintained close contact nearly two years after the appellant filed for divorce. Both Sally and Veronica testified that they never reported the abuse because they did not want to destroy their family. Once Billy was born and the appellant's new relationship was cemented, Sally and Veronica no longer had reason to keep the past abuse secret.

The appellant avers that the news of Billy's birth so upset Sally that she took Veronica to NCIS, "where she provided details which had never been previously disclosed to anyone."[14] This argument is not persuasive. Although there is strong evidence to suggest that Sally was motivated by Billy's birth to report the appellant and persuade Veronica to share the details of her abuse with NCIS after the appellant moved on with a new family, we are

---

[11] The appellant's father was a reluctant government witness and stated that he did not desire to testify. During direct examination he admitted to being "so infuriated with the information that [he] got hours earlier" concerning the abuse, that he struck the appellant after the appellant arrived at his home and told the appellant, "I'm your father, this is something I can't get you out of." Record at 516-17. The appellant's father also testified that the appellant told him, "Dad, I mean, what can I tell you . . . [i]t's not like that" and referring to Sally, "[y]ou are going to believe that person?" *Id.*

[12] Prosecution Exhibit (PE) 4.

[13] PE 5.

[14] Appellant's Brief and Assignment of Error of 20 Jul 16 at 7 (citation omitted).

convinced that the underlying facts regarding that abuse are true. Indeed, the appellant concedes that Sally confronted him about the abuse as soon as Veronica made the initial allegations in 2007. It was only Sally's desire to keep the family together—no longer viewed by Sally as a possibility after the birth of Billy—that prevented a timely report.

Likewise, the delay in reporting does not lead us to doubt Veronica's testimony. She testified that throughout and after the abuse the appellant forbade her from reporting it, leading her to believe she would lose her family if she told anyone.[15] As noted *supra*, although she did not report the abuse to law enforcement until much later, Veronica confirmed to her mother in early 2007 that the abuse had occurred.

We also find no credible evidence that Veronica's memory was manipulated or corrupted. A defense expert on memory manipulation emphasized during his testimony that memories are most easily contaminated in preschool-aged children.[16] However, Veronica was between the ages of 11 and 13 at the time of the abuse—far more mentally developed than a toddler. The expert also did not personally interview Veronica and did not specifically conclude that her memory had been contaminated.

The appellant next contends that Veronica's continuing relationship with the appellant belies her allegations of molestation. We do not speculate as to why Veronica remained in contact with the appellant after the abuse occurred, but we recognize there are many reasons a victim might maintain a relationship with a perpetrator, especially in a familial setting. Importantly, for several years after the abuse, Veronica was a child who lived with her mother. As long as Sally continued to maintain a familial relationship with the appellant, so too, necessarily, would Veronica. Additionally, Veronica suggested several such reasons during her testimony, including that she feared harming the appellant's relationship with her sisters—the appellant's biological daughters—and she did have some happy childhood memories of the appellant as her father.[17]

Finally, in light of all the other evidence, especially the appellant's own text messages to Sally implying he was at fault and could be jailed for his actions, we find the appellant's testimony self-serving and unreliable. Additionally, we note the appellant's version of events corroborates much of the other witness testimony. The appellant admits to being alone with

---

[15] Record at 452-53.

[16] *Id*. at 661.

[17] *Id*. at 501-03.

Veronica, disciplining her with a belt, being confronted by Sally, and driving to his father's house where he apologized for some conduct.

As a result, and with the exception of the "*on divers occasions*" language in Specification 2 under Charge III, noted *supra*, we are convinced that when viewed in a light most favorable to the prosecution, a rational trier of fact could have found each element of each of the specifications proven beyond a reasonable doubt and we, ourselves, are convinced beyond a reasonable doubt of the appellant's guilt to each of the specifications.

## B. Propensity evidence

Before their deliberations on findings, the military judge instructed the members concerning their use of charged sexual misconduct, pursuant to MILITARY RULE OF EVIDENCE (MIL. R. EVID.) 414, SUPPLEMENT TO MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), as evidence of the appellant's propensity to commit the other charged sexual misconduct:

> Evidence that the accused committed the sexual assault alleged in any of the specifications under the three charges may have no bearing on your deliberations in relation to the other specifications unless you first determine by a preponderance of the evidence, that is more likely than not, the offenses alleged in that specification occurred. If you determine by a preponderance of the evidence the offense alleged in one of the specifications under the three charges occurred, even if you are not convinced beyond a reasonable doubt that the accused is guilty of that offense, you may nonetheless then consider the evidence of that offense for its bearing on any matter to which it is relevant in relation to any other specification. You may also consider the evidence of that specification for its tendency, if any, to show the accused's propensity or predisposition to engage in sexual assault.[18]

We review the admissibility of evidence under MIL. R. EVID. 414 for an abuse of discretion. *United States v. Ediger*, 68 M.J. 243, 248 (C.A.A.F. 2010). "Whether a panel was properly instructed is a question of law" we review *de novo*. *United States v. Ober*, 66 M.J. 393, 405 (C.A.A.F. 2008) (citations omitted).

In *Hills*, the military judge granted a government motion under MIL. R. EVID. 413 to admit all of the charged conduct as evidence of Hills' propensity to commit the sexual assaults with which he was charged. *Hills*, 75 M.J. at 352-53. Hills' charged misconduct involved a single victim and a single course

---

[18] *Id*. at 764-65; Appellate Exhibit LVIII.

of conduct, with Hills committing several offenses over the course of a couple hours while his victim passed in and out of consciousness. Our superior court found that a military judge was "operat[ing] under an erroneous view of the law when he admitted the charged offenses as [MIL. R. EVID.] 413 evidence to show [the a]ppellant's propensity to commit [other] charged offenses, and thus abused his discretion." *Id.* at 355. Since *Hills,* military appellate courts have struggled with defining the breadth and scope of the decision.[19] However, in *United States v. Hukill*, the Court of Appeals for the Armed Forces clarified that:

> the use of evidence of charged conduct as [MIL. R. EVID.] 413 propensity evidence for other charged conduct in the same case is error, regardless of the forum, the number of victims, or whether the events are connected. Whether considered by members or a military judge, evidence of a charged and contested offense, of which an accused is presumed innocent, cannot be used as propensity evidence in support of a companion charged offense.

__ M.J. __, No. 17-0003/AR, slip op. at *6 (C.A.A.F. May 2, 2017).

Although *Hills* dealt with MIL. R. EVID. 413, the analysis under MIL. R. EVID. 414 is the same.[20] Therefore, we hold that because "evidence of the charged sexual misconduct was already admissible in order to prove the offenses at issue," the application of MIL. R. EVID. 414—"a rule of

---

[19] *See United States v. Tafoya*, No. 20140798, 2017 CCA LEXIS 107, at *3, unpublished op. (A. Ct. Crim. App. 14 Feb 2017) (summary disposition) (finding *Hills'* application in a case tried before a military judge "significantly different" and finding "no concern that appellant's constitutional rights, including the presumption of innocence, were somehow eroded by the military judge's consideration of propensity evidence"); *United States v. Guardado*, 75 M.J. 889, 896 (A. Ct. Crim. App. 2016) (discussing the scope of the *Hills* decision and holding that *Hills* "prohibit[s], *under all circumstances*, giving a propensity instruction based on a charged offense") (emphasis added); *United States v. Mancini*, No. 38783, 2016 CCA LEXIS 660, at *36, unpublished op. (A.F. Ct. Crim. App. 7 Nov 2016) (noting the "ultimate holding in *Hills* would [not] have been different had the charged offenses involved multiple victims or differing offense dates").

[20] *See United States v. Tanner*, 63 M.J. 445, 448-49 (C.A.A.F. 2006) (noting the similar legislative history of MIL. R. EVID. 413, its "companion rule," and finding that MIL. R. EVID. 414, like MIL. R. EVID. 413, establishes a presumption in favor of admissibility of evidence of prior similar crimes, in order to show predisposition to commit the designated crimes.); *United States v. Bonilla*, No. 20131084, 2016 CCA LEXIS 590, at *22-23, unpublished op. (A. Ct. Crim. App. 30 Sep 2016) (analyzing propensity evidence admitted under MIL. R. EVID. 414 using the same standards applied to evidence admitted under MIL. R. EVID. 413).

admissibility for evidence that would otherwise not be admissible—was error." *Hills*, 75 M.J. at 352.

As a result, the military judge's instruction, while modeled on the Military Judges' Benchbook,[21] was error and "implicate[d] 'fundamental conceptions of justice' under the Due Process Clause by creating the risk that the members would apply an impermissibly low standard of proof"—a preponderance of evidence standard—and thereby "undermin[e] both 'the presumption of innocence and the requirement that the prosecution prove guilt beyond a reasonable doubt[.]'" *Id.* at 357 (quoting *United States v. Wright*, 53 M.J. 476, 481 (C.A.A.F. 2000)). Where an instructional error rises to a constitutional dimension, we review the error to determine if it was harmless beyond a reasonable doubt. *United States v. Kreutzer*, 61 M.J. 293, 298 (C.A.A.F. 2005). A constitutional error is harmless beyond a reasonable doubt if the error complained of did not contribute to the verdict obtained. *United States v. McDonald*, 57 M.J. 18, 20 (C.A.A.F. 2002). In determining, then, whether the military judge's erroneous instruction contributed to the verdict, we must consider the "whole record." *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986).

Since *Hills*, several courts have found no prejudice, despite the erroneous admission of charged misconduct as propensity evidence. In *United States v. Bonilla*, No. 20131084, 2016 CCA LEXIS 590, unpublished op. (A. Ct. Crim. App. 30 Sep 2016), the Army Court of Criminal Appeals upheld Bonilla's convictions for sexual assault, finding that the burden of proof had been reinforced throughout the trial, the victim's account of the sexual assaults was corroborated by physical evidence, and the TC did not reference the propensity evidence in his argument. Similarly, the Air Force Court of Criminal Appeals found an erroneous propensity instruction to be harmless beyond a reasonable doubt after concluding that the victim's testimony was credible, the propensity evidence was not a focus of the prosecution, and the appellant's admissions supported the findings. *United States v. Harrison*, No. 38745, 2016 CCA LEXIS 431, at *34-36, unpublished op. (A.F. Ct. Crim. App. 20 Jul 20 2016), *aff'd*, No 17-0063/AF, 2017 CAAF LEXIS 91 (C.A.A.F. Feb. 13, 2017) (summary disposition).

In our only previous decision applying *Hills*, we set aside a chief petty officer's convictions for sexual assault, abusive sexual contact, and assault consummated by battery after finding the military judge admitted charged misconduct as propensity evidence pursuant to MIL. R. EVID. 413 and then provided the same erroneous instruction found in *Hills. United States v. Ellis*, No. 201500163, 2016 CCA LEXIS 516 (N-M. Ct. Crim. App. 30 Aug 2016). We

---

[21] Dept. of the Army Pamphlet 27-9 at 1105-06 (10 Sep 2014).

noted that while the government's case was strong, "it suffered some of the same weaknesses that concerned the CAAF in *Hills*"—a lack of physical evidence, no eyewitnesses, and inconsistent statements from the victims. *Id.* at \*10-11. As a result, we could not be "certain, beyond a reasonable doubt, that error did not contribute to Chief Ellis's convictions." *Id.* at \*11.

After considering the record as a whole, we find the facts of this case distinguishable from both *Hills* and *Ellis* and conclude that any error surrounding the admission of propensity evidence in this case to be harmless beyond a reasonable doubt. As we noted *supra*, Veronica's testimony was compelling and was corroborated by Betty and the appellant's own incriminating text messages. Moreover, the TC did not reference the propensity instruction or refer to propensity evidence during either his closing argument or in rebuttal. Rather, the TC reiterated, time and again, the government's burden of proving each and every element of every specification beyond a reasonable doubt. Consequently, we are convinced beyond a reasonable doubt that the propensity instruction did not contribute to the findings of guilty or the appellant's sentence.

## C. Reassessment of sentence

Having set aside a portion of the appellant's conviction, we must reassess the sentence. Courts of Criminal Appeals (CCAs) can often "modify sentences 'more expeditiously, more intelligently, and more fairly' than a new court-martial[.]" *United States v. Winckelmann*, 73 M.J. 11, 15 (C.A.A.F. 2013) (quoting *Jackson v. Taylor*, 353 U.S. 569, 580 (1957)). In such cases, CCAs "act with broad discretion when reassessing sentences." *Id.*

Reassessing a sentence is only appropriate if we are able to reliably determine that, absent the error, the sentence would have been at least of a certain magnitude. *United States v. Harris*, 53 M.J. 86, 88 (C.A.A.F. 2000). A reassessed sentence must not only "be purged of prejudicial error [but] also must be 'appropriate' for the offense involved." *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986).

Under all the circumstances presented, we find that we can reassess the sentence and that it is appropriate for us to do so. The penalty landscape is unchanged. The maximum punishment remains life without the possibility of parole, and setting aside "on divers occasions" language in one specification does not lessen the appellant's punitive exposure. Moreover, we have sufficient experience and familiarity with child sexual abuse offenses to determine reliably what sentence would have been imposed at trial. Finally, although the appellant was sentenced by members, the remaining convictions for rape, sodomy, indecent acts and indecent liberties capture the gravamen of the appellant's criminal misconduct. Indeed, the members sentenced the

appellant based on evidence of a single incident of kissing Veronica. *See Winckelmann*, 73 M.J. at 15-16.

Taking these facts as a whole, we can confidently and reliably determine that, absent the error, the members would have imposed the same sentence. We also conclude that the adjudged sentence is an appropriate punishment for the modified offenses and this offender—thus satisfying the *Sales* requirement that the reassessed sentence not only be purged of error, but appropriate. *Sales*, 22 M.J. at 308.

## III. CONCLUSION

The guilty finding to Specification 2 of Charge III is affirmed except for the words "*on divers occasions*." The remaining findings and the sentence as approved by the CA are also affirmed.

Senior Judge CAMPBELL and Judge RUGH concur.

For the Court



R.H. TROIDL
Clerk of Court