Chief Judge GIERKE
delivered the opinion of the Court.
INTRODUCTION
Article 46 of the Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 846, commands that the “trial counsel, the defense counsel, and the court-martial shall have equal opportunity to obtain witnesses and other evidence ____[1],[1] This case involves the application of Article 46 to the designation of expert consultants to aid the opposing parties. We hold that the Government violated Article 46 when it assigned the Air Force’s premier shaken baby syndrome expert to itself, while denying the defense’s request for an adequately-qualified expert and instead providing the defense with a consultant with no apparent experience in the area of shaken baby syndrome.
BACKGROUND
Appellant was tried by a general court-martial consisting of officer and enlisted members. Appellant was charged with two specifications of aggravated assault on his infant son in violation of Article 128, UCMJ, 10 U.S.C. § 928.[2] He pleaded not guilty. The court-martial found Appellant guilty of the lesser included offense of assault and battery as to the first specification and found him not guilty of the second.[3]
The charges grew out of an incident that occurred while Appellant was caring for his son, BT, when he was seventy-seven days old. Appellant was home on the morning of August 22, 2000, preparing for a meeting with his commanding officer that could potentially lead to nonjudicial punishment. As Appellant ironed his uniform, his wife left the house to borrow five dollars from her parents so Appellant could get a haircut before the meeting. She was gone for about one hour. When Appellant’s wife returned, she found BT in her husband’s arms. BT’s “arms and legs were slumped over. He was crying and no tears were coming out of his eyes,” and he was “hardly moving at all.” As the Air Force Court explained, Appellant’s wife asked what happened. Appellant replied that he was holding BT “in his left arm with the baby’s head facing him while he ironed with his right. He said that while holding BT in this manner, the baby ‘sprung’ from his chest. He said he was able to catch BT mid-waist before he hit the ground.”[4] Appellant told his wife that he had already called the emergency room and was advised to watch BT and call back if his condition worsened.
Appellant’s wife remained concerned because BT was “breathing strange and there were no tears coming out of his eyes and he was real pale looking.” She called a civilian hospital. While she was on the phone, Appellant interrupted her and told her that at one point while she was gone, BT’s heart had stopped. In light of this information, the *116 civilian medical personnel advised Appellant’s wife to take BT to the nearest emergency room, which was the base medical facility. Appellant “resisted the idea of going, but after arguing with his wife about it for 15 minutes, he agreed to go.”[5] Before they left, Appellant’s wife started to change BT’s clothes and diaper. Appellant told her, “[B]efore you take the jammies off, you are going to see something, and don’t freak out when you see it---- There are bruises up and down [BT’s] side. Don’t freak out when you see them.”
At the emergency room, Appellant “repeated his explanation as to how the bruises occurred. Health care providers examined BT and concluded the baby’s condition simply warranted at-home observation.”[6]
Six days later, Appellant’s wife took BT “to a routine checkup at the on-base medical facility. The examining physician expressed some concerns about the child’s appearance and ordered additional testing____ The tests revealed BT had spots of bleeding on his brain, and the child was admitted for further evaluation.”[7]
Air Force Office of Special Investigations agents then interviewed Appellant, who “provided verbal and written statements.”[8]
[Appellant] told the agents he had felt stressed out over his meeting with his commander. While his wife was gone, BT was sitting in a chair on the floor and started to cry. He admitted he went over to the chair and “quite aggressively” pulled BT out of the chair by his mid-section and brought him to his shoulder. He told the agents the baby’s chin hit his shoulder, causing the baby’s head to tilt back. He described the baby’s reaction as “surprised.” He said he then changed BT’s clothes and diaper, but did not notice any bruising. He told agents he then went back to unplug the iron and was holding BT on his left forearm face down when BT kicked off his chest and started to fall. The appellant said he dropped the iron and caught BT about the abdomen. In his written statement, the appellant concluded that his “actions in pulling [the baby] aggressively against my chest is [sic] probably the reason he sustained the bruising inside his head” and “what gave him the bruises on his abdomin [sic].” He specifically denied shaking BT.
The appellant told his wife a similar version of events that evening in their bedroom. He got on his knees and said, “I have not been completely honest with you.” He went on to describe how BT was in his “bouncy chair” and crying and there came a point when he “couldn’t take the crying no more. So I took him in one big swipe to my shoulder.” He said that this grabbing motion was in addition to catching BT in mid-air when BT “sprung” from his arms.
The appellant made an additional statement to a co-worker in the fall of 2000 ---- The appellant [said] that his son had injuries consistent with shaking a baby. The appellant told his co-worker the injuries were caused when he went over to a couch to pick up BT and the baby squirmed out of his arms, falling to the couch and hitting the floor.[9]
Before the charges against Appellant were referred to the general court-martial, the trial counsel obtained Lieutenant Colonel (Dr.) Stephen Boos as a Government expert assistant. Dr. Boos was an Air Force pediatrician with considerable experience concerning shaken baby syndrome. In the words of the trial counsel’s opening statement, Dr. Boos “is the only fellowship-trained expert on child abuse in the Air Force, and one of the few fellowship-trained experts in the United States.”
Also before referral, Dr. Boos recommended to the trial counsel that another Air Force physician, Lieutenant Colonel (Dr.) Susan Brown, be appointed as the defense’s expert consultant. On March 15, 2001, the *117 day before charges were referred, the trial counsel sent an e-mail to the defense counsel proposing Dr. Brown’s appointment as a defense expert.
The following day, charges were referred and the defense asked the convening authority to fund the appointment of Dr. Wilbur Smith, a civilian pediatric radiologist, as a defense expert consultant.[10] The defense request noted that the Government had sought to provide Dr. Brown to the defense. The defense opposed that suggestion, observing that Dr. Boos had more extensive experience concerning “infant physical abuse (e.g., ‘shaken baby syndrome’) compared to Dr. Brown.” Dr. Brown specialized in adolescents.
Before appointing an expert consultant for the defense, the convening authority received several documents concerning the defense request that were neither attached to the record nor revealed to the defense. While these documents were not attached to the record and the Air Force Court denied a defense motion for their production, they apparently included a memorandum from the trial counsel to the convening authority recommending denial of the defense request for Dr. Smith.
Despite the defense’s request for a different expert, the convening authority appointed Dr. Brown as the defense expert.
In a pretrial motion, the defense asked the military judge to order the convening authority to appoint the defense’s preferred expert consultant instead. The motion expressly relied on, among other authorities, Article 46’s guarantee that the Government and the-. defense shall have equal opportunity to obtain witnesses and other evidence. The defense submitted a supporting affidavit from Dr. Brown. The affidavit stated that “[i]n the area of child abuse, I have the most direct clinical experience with child sexual abuse. I have not, however, been a consultant or witness at trial for Shaken Baby Syndrome.” Dr. Brown added that while she felt “competent in this area of child abuse, specifically, Shaken Baby Syndrome, I am not the equivalent of Dr. Stephen Boos. There are other physicians who are better qualified than me when it comes to ‘Shaken Baby cases.” The motion also averred that based on the defense counsel’s conversations with Dr. Brown, the defense counsel believed she would merely “defer” to the opinions of Dr. Boos, the Government expert. The motion specifically alleged that while Dr. Brown “is able to advise the [djefense generally on the timing of the injuries,” she could not advise the defense concerning “possible alternative explanations.” These averments are contained in the defense motion’s fact section. In his original ruling on the motion, the military judge’s “findings” included the following: “For purposes of this motion, the defense statement of facts is accepted.”[11]
*118 The military judge did not order the appointment of the requested civilian defense expert, but, due to Dr. Brown’s unavailability on the scheduled trial date, ordered the convening authority to appoint a replacement expert. A short time later, when Dr. Brown’s schedule changed to eliminate the conflict, the Government sought reconsideration of the military judge’s order. The military judge then rescinded his previous order and found that Dr. Brown was competent to serve as the defense’s shaken baby syndrome consultant.
Dr. Boos testified as a Government witness at trial. Neither Dr. Brown nor any other medical expert testified for the defense. At the conclusion of the fully contested trial, the members found Appellant not guilty of one of the aggravated assault specifications and, as to the other, guilty of the lesser included offense of assault and battery on a child under sixteen.
DISCUSSION
A. Article 46
This case involves a violation of both the letter and the spirit of Article 46. Under Article 46, the defense’s “opportunity to obtain witnesses and other evidence” is to be equal to the Government’s. But in this case, the Government had already secured its expert witness before the defense had an opportunity to seek its own. The Government exploited this advantage by securing one of the Air Force’s preeminent experts concerning shaken baby syndrome as its own witness.
Article 46 deals with the “opportunity to obtain witnesses and other evidence.” While the defense request in this case was for an expert consultant rather than an expert witness,[12] Article 46 is still applicable. One important role of expert consultants is to help counsel develop evidence.[13] Even if the defense-requested expert consultant would not have become an expert witness, he would have assisted the defense in evaluating, identifying, and developing evidence. Another important function of defense experts is to test and challenge the Government’s case. The denial of a defense expert with professional qualifications reasonably comparable to those of the Government’s expert interfered with this function.
We have held that “[a]n accused is entitled to expert assistance provided by the Government if he can demonstrate necessity.”[14] As the lower court observed, “there has been no dispute in this case as to the appellant’s need for some type of expert assistance.”[15] Rather, the issue in this case is whether the expert the Government provided to the defense was an adequate substitute for the defense-requested civilian expert.
Of course, neither the convening authority nor the military judge was required to provide the defense with the particular expert it requested.[16] But because expert assistance was necessary for the defense, the Government could deny the requested expert only if it provided an “adequate substitute.”[17]
Expert assistants are frequently detailed to the parties litigating contested courts-martial. And “[wjith the rapid growth of forensic science techniques, it has become increasingly apparent that complex cases require more than general practitioners.”[18] The trial counsel appeared to recognize that reality by securing a leading shaken baby syndrome expert for the prosecution team. Yet a generalist with no apparent expertise in that *119 specific area was assigned as the defense consultant.
In affirming the military judge’s ruling, the Air Force Court wrote that “Dr. Brown’s impressive credentials belie the appellant’s averment that she had no experience and training in ‘shaken baby syndrome.’ ”[19] Yet neither the Air Force Court nor the dissent has identified anything in the record demonstrating that Dr. Brown had any experience in the area of shaken baby syndrome.[20] On the contrary, the Air Force Court explicitly acknowledged that none of the previous military justice eases on which Dr. Brown worked “involved shaken baby syndrome.”[21] The Government similarly argues that Dr. Brown was “an expert with impressive credentials,” but offers no credentials or experience concerning shaken baby syndrome — the area of expertise relevant to this ease and an area in which the Government expert specialized. This failure is particularly striking because it was the Government who proposed and obtained Dr. Brown as a defense expert. The Government would seem to be well positioned to call attention to any special expertise that Dr. Brown had in this area, yet the Government has not done so. Nor have we found any indication in the record that Dr. Brown had any experience dealing with shaken baby syndrome.
The Government, however, argues that it was sufficient to provide a generalist to the defense. Quoting our opinion in United States v. Short, the Government argues, “All that is required is that competent assistance be made available.”[22] That quotation originates from our decision in United States v. Burnette,[23] where it was immediately followed by a citation to the Supreme Court’s opinion in Ake v. Oklahoma.[24] Ake is, of course, a civilian case based on the “Fourteenth Amendment’s due process guarantee of fundamental fairness.”[25] The Court applied that fundamental fairness guarantee to require that
when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.[26]
The Court then cautioned, “This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own.”[27] So the legal issue in Short, Burnette, and Ake was distinct from the issue in this case, which concerns Article 46. Providing the defense with a “competent” expert satisfies the Government’s due process obligations, but may nevertheless be insufficient to satisfy Article 46 if the Government’s expert concerning the same subject matter area has vastly superior qualifications.
Given the facts of this case, Article 46 requires that an “adequate substitute” for Dr. Smith have qualifications reasonably similar to those of the Government’s expert, Dr. *120 Boos. Indeed this “adequate substitute” standard is stated in Rule for Courts-Martial (R.C.M.) 703(d). The absence of such parity opens the military justice system to abuse, because the Government in general, and — as this case demonstrates — -the trial counsel in particular, may play key roles in securing defense experts. Appellant’s brief analogizes this situation to “permitting a Major League baseball manager to choose the opposing pitcher in the final game of the World Series.” Article 46 is a clear statement of congressional intent against Government exploitation of its opportunity to obtain an expert vastly superior to the defense’s. Requiring that an “adequate substitute” for a defense-requested expert have professional qualifications at least reasonably comparable to those of the Government’s expert is a means to carry out that intent where the defense seeks an expert dealing with subject matter similar to a Government expert’s area of expertise and where the defense expert is otherwise adequate for the requested purpose.
Under the approach of the lower court and the dissent, the prosecution would always be free to secure preeminent experts for itself while detailing minimally competent experts to the defense. Article 46 reveals that Congress intended a more even playing field.
There is no litmus test standard for determining whether a substitute for a defense-requested expert is adequate. Rather, this is a fact-intensive determination that is committed to the military judge’s sound discretion. In this case, the substitute clearly did not meet this standard.
The relevant area of expertise in this case concerned whether injuries to a seventy-seven-day-old baby had been caused by shaking. The Government’s expert was a pediatrician with extensive experience and training in the specific area of shaken baby syndrome. The trial counsel exploited the Government expert’s credentials by telling the members that he “is the only fellowship-trained expert on child abuse in the Air Force, and one of the few fellowship-trained experts in the United States.” The defense expert, on the other hand, specialized in adolescents — an area of specialization obviously far less relevant to determining the cause of the seventy-seven-day-old victim’s injuries. She had no apparent experience with shaken baby cases.
In rejecting the defense’s challenge to the proffered substitute expert, neither the military judge nor the Air Force Court considered the necessity to ensure that the “adequate substitute” offered by the Government had professional qualifications reasonably comparable to those of the Government’s expert. Both of those rulings constituted an abuse of discretion because they were influenced by an erroneous view of the law.[28] The military judge erred by denying the defense’s motion for a more qualified expert assistant. We do not hold that the military judge was required to make Dr. Smith available to the defense. Rather, we hold that the defense was entitled to an expert who could adequately substitute for Dr. Smith and who had qualifications reasonably comparable to those of the Government expert who testified in the same subject area. Dr. Brown did not satisfy that requirement.
The dissent complains that our holding is “completely unsupported by any citation to supporting authority.”[29] On the contrary, our holding cites, and rests on, the plain wording of Article 46. That plain language is the best source for discovering Congress’s intent.[30]
*121 The dissent’s discussion of the Sixth Amendment is inapposite. Congress was free to, and did, adopt a more protective statutory system for military accused than the Constitution provides for civilians in a criminal trial.[31] Nor is it surprising that an analysis of Article 46 might yield results different from those suggested by the Sixth Amendment, federal statutes, or the Federal Rules of Criminal Procedure, because the language in those authorities differs from that of Article 46.
Additionally, in construing Article 46, we cannot simply defer to the rules contained within the Manual for Courts-Martial (MCM). As a congressional statute, Article 46 prevails over any limiting interpretation of an MCM provision.[32] To the extent that Article 46 provides rights beyond those contained within R.C.M. 703, it is our judicial duty to enforce the statutorily-established rights.
This opinion applies the plain meaning of a congressional statute to the facts of this case. That task is the very essence of judging. We are not applying a principle today that did not exist when this case was tried. Article 46 was enacted in 1950.[33] Had the military judge applied the plain meaning of Article 46, he would have recognized that Dr. Brown was not sufficiently qualified to adequately serve as a substitute expert in light of the prosecution’s retention of Dr. Boos as its expert.
Finally, the dissent questions Dr. Smith’s expertise in an apparent attempt to suggest that Dr. Brown was no less qualified than Dr. Smith, so Dr. Brown was an adequate substitute.[34] But as the record establishes and other appellate courts have found, Dr. Smith is a recognized expert in the area of shaken baby syndrome.
As his curriculum vitae demonstrates, Dr. Smith had both published and lectured in the specific area of shaken baby syndrome, as well as such relevant areas as diagnosing head injuries, head injuries in child abuse, imaging in child abuse, and pediatric imaging.
The statement of facts in Appellant’s motion, which the military judge’s original findings expressly accepted, also establishes that Dr. Smith “has extensive experience in diagnosing head trauma in infants. He has the training and experience in evaluating cases like [BT’s].”
Given Dr. Smith’s impressive credentials, it is not surprising that in cases dealing with shaken baby syndrome, the Air Force Court of Criminal Appeals, the Missouri Court of Appeals, and Justice Toal of the South Carolina Supreme Court have noted his exper *122 tise.[35] Like Dr. Boos, Dr. Smith was clearly a highly qualified expert in the field of shaken baby syndrome. Dr. Brown was not an adequate substitute.[36]
B. Prejudice
In this ease, the nature of the legal error— the denial of a sufficiently qualified expert— interferes with Appellant’s ability to demonstrate prejudice. The Army Court of Criminal Appeals has recently referred to this situation as “a classic military defense counsel dilemma.”[37] The Army Court explained:
The best way to articulate and explain the need for an expert is by using just such an expert to describe their evidence analysis and development process. But experts, when not already employed by the government, charge fees for their services, and detailed defense counsel normally do not have access to money to pay for such initial services, in order to obtain preliminary consultation or evaluation services.[38]
This “military defense counsel dilemma” also explains why the defense never requested Dr. Smith as an expert witness. Until the defense had obtained the funds to consult with Dr. Smith, it was unable to determine whether his testimony would have been helpful or harmful. Consulting with an expert will often be a necessary precondition to establishing the expert’s necessity as a witness. But in this case, the defense never had an opportunity to consult with Dr. Smith or a substitute expert with professional qualifications reasonably comparable to Dr. Boos’s. The Government, on the other hand, labors under no similar burden to demonstrate necessity before securing its own experts.
We will not adopt a prejudice standard that functions as a self-defeating Catch-22.[39] Rather, we will presume prejudice in this ease where: (1) the Government denied the defense’s request for an expert and instead provided the defense with a substitute expert of its choice; (2) the Government had obtained an expert in the same subject matter area for itself; (3) the defense challenged the relative qualifications of the substitute expert; (4) the military judge denied a defense motion seeking an order requiring the originally-requested expert to be detailed to the case; and (5) the substitute expert provided by the Government was not adequate because her professional qualifications concerning shaken baby syndrome were not reasonably comparable to those of the Government’s expert.[40]
*123 While the Government can attempt to overcome that presumption of prejudice, it has not done so here. The specification of which Appellant was convicted, as excepted by the members, alleged that on or about August 22, 2000, Appellant assaulted BT “by grabbing and shaking him with his hands.” That conviction may well have been influenced by Dr. Boos’s extensive testimony, during which he opined that BT’s “injuries appear to have occurred from either extremely vigorous shaking, severe shaking beyond what you would expect to do to a normal baby, something that people would recognize as potentially harmful or from [BT] having his head suddenly decelerated probably by being swung against a surface.” The military judge’s erroneous denial of the defense motion for a more qualified expert consultant left the defense without the adequate tools to analyze and possibly challenge or rebut that opinion. Accordingly, the members’ finding that Appellant committed an assault and battery must be reversed.
DECISION
The decision of the United States Air Force Court of Criminal Appeals is reversed. The findings of guilty and the sentence are set aside. The record of trial is returned to the Judge Advocate General of the Air Force. A rehearing on the findings and the sentence is authorized.

. 10 U.S.C. § 846 (2000).

. 10 U.S.C. § 928 (2000).

. The members sentenced Appellant to a bad-conduct discharge, confinement for eighteen months, forfeiture of all pay and allowances, and reduction to pay grade E-l. The convening authority approved the sentence as adjudged. The Air Force Court of Criminal Appeals affirmed. United States v. Warner, 59 M.J. 573, 583 (A.F.Ct.Crim.App.2003). We then granted review. United States v. Warner, 60 M.J. 124 (C.A.A.F.2004). The two granted issues were:
I. WHETHER THE MILITARY JUDGE ERRED BY DENYING APPELLANT’S MOTION FOR APPROPRIATE RELIEF SEEKING A FULLY COMPETENT EXPERT CONSULTANT.
II. WHETHER THE GOVERNMENT VIOLATED ARTICLE 46, RULE FOR COURTS-MARTIAL 703, AND THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION BY ALLOWING THE ASSISTANT TRIAL COUNSEL TO SELECT THE DEFENSE EXPERT CONSULTANT AND PROVIDE ADVERSE EX PARTE ADVICE TO THE CONVENING AUTHORITY CONCERNING THE DEFENSE REQUEST FOR AN EXPERT CONSULTANT.
Because we rule for Appellant on Issue I, we need not reach Issue II.

. Warner, 59 M.J. at 575.

. id.

. Id.

. Id. at 576.

. Id.

. Id.

. As this request to the convening authority and the later litigation before the military judge demonstrate, the dissent is incorrect when it asserts, "[t]he defense made no request for any expert witness.” United States v. Warner, 62 M.J. 114, 131 (C.A.A.F.2005)(Crawford, J., dissenting).

. A curious aspect of this case is the disagreement between the majority and the dissenter as to the factual predicate relating to Issue I. This disagreement reaffirms the wisdom of Senior Judge Everett in reminding everyone involved in a military justice case (litigants, judges, and staff judge advocates) of the primary task to preserve the facts when he said, " 'Always salt down [preserve] the facts first; the law will keep.'" United States v. Haney, 45 M.J. 447, 448 (C.A.A.F.1996)(quoting Erickson v. Starling, 235 N.C. 643, 71 S.E.2d 384, 395-96 (N.C.1952)). In the present case, it is the view of the majority that the operative facts were preserved by the military judge expressly adopting the defense’s statement of facts in the military judge’s own findings. We therefore disagree with the dissent when it alleges that these facts of record are "not before this Court as anything other than unsupported argument ... 'averred' in written pretrial motions....” Warner, 62 M.J. at 130 (Crawford, J., dissenting); see also id. at 124, 127, 132-33. It is the majority view that the military judge’s order on the Government’s reconsideration motion rescinded the earlier order, but that did not obligate the defense to reprove matters that the military judge had previously found as fact. The military judge rescinding the earlier order did not wipe clean the factual slate in the record of the defense request for expert assistance. To hold otherwise would be remarkably cumulative and problematic, as it would require a potentially lengthy evidentiary hearing to reprove facts that the military judge had already expressly adopted as the operative facts for the defense request for expert assistance.

. See generally United States v. Langston, 32 M.J. 894 (A.F.C.M.R.1991) (discussing distinction between expert consultants and expert witnesses).

. See Janet Weinstein, Coming of Age: Recognizing the Importance of Interdisciplinary Education in Law Practice, 74 Wash. L.Rev. 319, 325 (1999).

. United States v. Gunkle, 55 M.J. 26, 31 (C.A.A.F.2001).

. Warner, 59 M.J. at 578.

. United States v. Calhoun, 49 M.J. 485, 487-88 (C.A.A.F.1998).

. United States v. Ford, 51 M.J. 445, 455 (C.A.A.F.1999)(quoting Rule for Courts-Martial 703(d))(quotation marks omitted).

. United States v. McAllister, 55 M.J. 270, 275 (C.A.A.F.2001).

. Warner, 59 M.J. at 579.

. The dissent takes issue with our statement that nothing in the record demonstrates that Dr. Brown had experience in the area of shaken baby syndrome. Warner, 62 M.J. at 130 (Crawford, J., dissenting). But the dissent argues to the contrary by relying on Dr. Brown’s affidavit, which does not claim any experience in the area of shaken baby syndrome. The affidavit merely reflects that Dr. Brown ”feel[s] competent in this area of child abuse." But that belief could have been based upon the availability of treatises on the subject unaccompanied by actual training. It neither claims nor demonstrates that Dr. Brown has experience in this area. We also take this opportunity to emphasize that this opinion implies no criticism of Dr. Brown. There is no reason to doubt that she performed her duties conscientiously. But, as she herself acknowledged, her qualifications in this area were not reasonably equivalent to Dr. Boos's.

. Id.

. 50 M.J. 370, 373 (C.A.A.F.1999).

. 29 M.J. 473, 475 (C.M.A.1990).

. 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).

. Id. at 76, 105 S.Ct. 1087.

. Id. at 83, 105 S.Ct. 1087.

. Id.

. See United States v. Sullivan, 42 M.J. 360, 363 (C.A.A.F.1995) (an appellate court "will reverse for an abuse of discretion if the military judge's findings of fact are clearly erroneous or if his decision is influenced by an erroneous view of the law”).

. Warner, 62 M.J. at 128 (Crawford, J., dissenting).

. See, e.g., Lamie v. United States Trustee, 540 U.S. 526, 536, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) ("We should prefer the plain meaning since that approach respects the words of Congress. In this manner we avoid the pitfalls that plague too quick a turn to the more controversial realm of legislative history.”); INS v. Cardoza-Fonseca, 480 U.S. 421, 433 n. 12, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (noting "the strong presumption that Congress expresses its intent through the language it chooses") (citations and quotation marks omitted). The dissent objects that we do not cite any case law supporting our *121 interpretation of Article 46. Warner, 62 M.J. at 128 (Crawford, J., dissenting). But case law must comport with Article 46, not vice versa. Moreover, this appears to be an issue of first impression. We must turn to the primary source of the statute, rather than case law, to resolve it. Finally, while we need not rely on case law to support our interpretation of Article 46’s plain language, we note that the dissent cites no case law inconsistent with today’s holding. The dissent cites four cases that it contends this case "implicitly modifies." Id. at 124 n. 7. Three of the four cases do not even cite Article 46. United States v. Gonzalez, 39 M.J. 459 (C.M.A.1994); United States v. Ndanyi, 45 M.J. 315 (C.A.A.F. 1996); Ford, 51 M.J. 445. The fourth, United States v. Garries, 22 M.J. 288 (C.M.A.1986), concerned a military judge’s denial of a defense motion for $1,500 for investigative assistance after the defense had already been offered, and declined, the services of an Air Force investigator operating under an order of confidentiality. There is no inconsistency between those opinions and this case.

. "In defining the rights of military personnel, Congress was not limited to the minimum requirements established by the Constitution, and in many instances, it has provided safeguards unparalleled in the civilian sector.” United States v. Mopes, 59 M.J. 60, 65 (C.A.A.F.2003) (quoting United States v. McGraner, 13 M.J. 408, 414 (C.M.A.1982)(quotation marks omitted)); see, e.g., Francis A. Gilligan, The Bill of Rights and Service Members, 1987 Army Law. 3, 10 (Dec. 1987) (servicemembers’ rights broader than constitutionally required).

. See, e.g., United States v. Swift, 53 M.J. 439, 451 (C.A.A.F.2000).

. Act of May 5, 1950, ch. 169, § 1 (Article 46), 64 Stat. 122 (current version codified at 10 U.S.C. § 846 (2000)).

. Warner, 62 M.J. at 127 (Crawford, J., dissenting).

. See United. States v. Stanley, 60 M.J. 622, 625 (A.F.Ct.Crim.App.2004) ("Dr. Wilbur Smith, an expert in radiology and SBS [Shaken Baby Syndrome], also testified.''); United States v. White, No. ACM 31474, 1996 WL 399973, at *1, 1996 CCA LEXIS 212, at *3-4 (A.F.Ct.Crim.App. July 12, 1996) (“Doctor Wilbur L. Smith, Professor of Pediatrics and Radiology, University of Iowa, a recognized expert in child abuse, testified that shaken baby syndrome is a syndrome in which an infant is shaken violently to and fro with such force that the acceleration and deceleration and gravitational forces cause significant brain injuiy.”); State v. Candela, 929 S.W.2d 852, 860 (Mo.Ct.App.1996) ("Dr. Smith and Dr. Alexander, experts on shaken infant syndrome, testified after Dr. Case.”); State v. Cutro, 332 S.C. 100, 504 S.E.2d 324, 331 (1998) (Toal, J„ dissenting) ("Dr. Wilbur Smith, Jr. also testified. As an expert in pediatric radiology and child abuse, he was, at the time of the trial, one of only 30 or fewer physicians in the country who were exam-certified in the field. He stated that because of the evidence of the retinal hemorrhages, the subdural hematomas, and subarachnoid hemorrhages, ‘there is no question [that] there is no other medical diagnosis’ than shaken baby syndrome.”).

. We observe that not only does the record fail to establish Dr. Brown as an expert with experience in shaken baby syndrome, but we have not identified any other appellate court that has either recognized or relied on her as an expert in this area.

. United States v. Kreutzer, 59 M.J. 773, 777 n. 4 (A.Ct.Crim.App.2004), aff'd, 61 M.J. 293 (C.A.A.F.2005).

. Id.

. Catch-22 is defined as a "problematic situation for which the only solution is denied by a circumstance inherent in the problem or by a rule." Webster’s Ninth New Collegiate Dictionary 215 (9th ed.1991). The origin of the phrase is found in the novel Catch-22 (1961) by Joseph Heller. Id.

. By listing these factors that were present in this case, we do not mean to imply that all must be present to warrant a presumption of prejudice where the Government has violated Article 46.