CRAWFORD, Judge
(dissenting):
The majority’s application of Military Rule of Evidence (M.R.E.) 302 would allow a defendant to obtain, at Government expense, an expert mental evaluation, devoted solely to the defense, and cloak with immunity any statements made during the examination. With this immunity in place, the defense is then free to call to the stand another Government-paid expert, whose opinion and testimony were likely based, at least in part, on both the earlier examination and the statements of the defendant made during that examination. This second expert could then testify for the defense without fear that the Government could either obtain or use the defendant’s statements made during the earlier examina *202 tion. The majority’s holding runs counter to the self-incrimination clause, is an improper balance of competing interests, and overlooks the history behind M.R.E. 302.
In describing the posture of this case, the majority omits an important, if not controlling, fact: the sanity board conducted by Colonel (Dr.) Marrero was requested by the defense, with all portions of the board report being delivered only to the defense. Although Rule for Courts-Martial (R.C.M.) 706(c)(3)(A) requires that the board’s ultimate conclusions on all questions “shall be submitted to the officer ordering the examination, [under R.C.M. 706(b)(1) ] ... and to all counsel in the case, the convening authority, and, after referral, to the military judge” (emphasis added), the results of this report— lock, stock, and barrel — were delivered only to the defense. This is hardly the instance of involuntary examination and compelled statements that the drafters of M.R.E. 302 had in mind.
In this case, a defense counsel zealously and creatively represented her client by skillfully manipulating the Rules for Courts-Martial, the Military Rules of Evidence, and military health care assets to achieve a case posture that counsel believed would prove most advantageous to her client at trial. That is her job. At trial, the trial counsel argued that this manipulation, and the testimony of Dr. Peterson, resulted in a waiver of Appellant’s privilege under M.R.E. 302 as to statements made by Appellant to an earlier sanity board convened at Appellant’s request. That is his job. In the interest of fairness and justice, the military judge construed the evidentiary and procedural rules to permit access to and use by the trial counsel of Appellant’s statements at the sanity board Appellant had requested. That is his job.
Because, as the majority correctly notes, we address neither a constitutional question nor one arising under Article 31, UCMJ, 10 U.S.C. § 831, it is now this Court’s job to decide whether the military judge’s decision to admit evidence in potential abrogation of a privilege was an abuse of his discretion.
The decision to admit evidence is reviewed for an abuse of discretion. Whether a conversation is privileged is a mixed question of law and fact. To find an abuse of discretion requires more than a mere difference of opinion — the challenged ruling must be “arbitrary, fanciful, clearly unreasonable,” or “clearly erroneous.”
United States v. McElhaney, 54 M.J. 120, 132 (C.A.A.F.2000)(internal citations omitted). “As has often been said, the purpose of a criminal trial is truthfinding within constitutional, codal, Manual, and ethical rules. Because the privilege rules limit truthfinding by excluding legally relevant evidence, these rules are not ‘favored’ by the federal courts.” United States v. Romano, 46 M.J. 269, 274 (C.A.A.F.1997) (internal citations omitted).
Like other federal courts, we should not construe rules conferring privileges in such a way as to defeat both the truth-finding process and the intent of the drafters. In United States v. Bledsoe, 26 M.J. 97 (C.M.A.1988), this Court construed M.R.E. 302, contrary to its literal language, to achieve what we perceived as the drafters’ intent. We should once again construe this rule so as to preserve that same intent, and to promote the orderly administration of military justice. M.R.E. 302 provides:
(a) General rule. The accused has a privilege to prevent any statement made by the accused at a mental examination ordered under R.C.M. 706 and any derivative evidence obtained through use of such a statement from being received into evidence against the accused on the issue of guilt or innocence or during sentencing proceedings. This privilege may be claimed by the accused notwithstanding the fact that the accused may have been warned of the rights provided by Mil. R. Evid. 305 at the examination.
(b) Exceptions.
(1) There is no privilege under this rule when the accused first introduces into evidence such statements or derivative evidence.
(2) An expert witness for the prosecution may testify as to the reasons for the expert’s conclusions and the reasons therefore as to the mental state of the accused if expert testimony offered by the defense as *203 to the mental condition of the accused has been received in evidence, but such testimony may not extend to statements of the accused except as provided in (1).
(c) Release of evidence. If the defense offers expert testimony concerning the mental condition of the accused, the military judge, upon motion, shall order the release to the prosecution of the full contents, other than any statements made by the accused, of any report prepared pursuant to R.C.M. 706. If the defense offers statements made by the accused at such examination, the military judge may upon motion order the disclosure of such statements made by the accused and contained in the report as may be necessary in the interests of justice.
This rule is designed to balance the competing interests of the self-incrimination clause and the insanity defense. Under the rule, the “prosecution may compel the accused to submit to government psychiatric examination.” But that expert may testify “only as to his or her conclusions and their basis and not the contents of any statements by the accused during the examination.” MCM, App. 22, A22-7.
FACTS
On May 29, 2001, Appellant, when he was restricted, was arrested for wrongfully trying to leave the post. Appellant’s first sergeant testified Appellant appeared normal when he was brought back to the unit. However, the next day Appellant was hospitalized because of what a co-worker thought was bizarre behavior. Dr. (Major) Karen Peterson, a psychiatrist, treated Appellant from May 31 to June 28,2001.
Later, pursuant to a defense request, the convening authority ordered a sanity board. The sole member of the board was Dr. (Colonel) Gregoria Marrero, a forensic psychiatrist. Upon completion of the examination, the sanity board report was returned directly to the defense team and not given to the trial counsel or the convening authority. While Dr. Marrero agreed with Dr. Peterson that Appellant suffered from a manic episode on May 29-30, 2001, Dr. Marrero concluded that Appellant knew what he was doing on those dates, and his hospitalization was due to malingering. After the sanity board, Appellant obtained the assistance of Dr. Peterson as a confidential consultant and notified the prosecution of the intent to raise the lack of mental responsibility as a defense. At trial, the defense called Dr. Peterson as an expert witness. She opined that there was a “high likelihood” that Appellant was suffering from a severe mental disease or defect on May 29 and 30, 2001. As a result of this, it would be difficult for Appellant to appreciate the nature and quality or the wrongfulness of his actions.
The record of trial reveals the following colloquy between defense counsel and Dr. Peterson:
Q. Was there anything else that you used to formulate that opinion?
A. This week, I also met for the first time an Airman Paytas and she described the change in his behavior back at this period of time. I also reviewed the sanity board written by Doctor Morrero [sic].
Q. Now, did you review that prior to formulating your opinion?
A. No and I wouldn’t want to. No. I looked at all the other information first then met with him.
Q. So, did you use that as part of your opinion, to base your opinion on?
A. Not to base my opinion on, I just wanted to see what my colleague — what her findings were. I came to my own conclusion and then I wanted to look at that and see what she had drawn up.
Emphasis added.
The following inquiry was with the military judge:
Q. Major, have you seen the charge sheet in this case?
A. Yes, I have.
Q. Do you know the offenses that were alleged to have occurred at approximately 29 or 30 May?
A. I don’t recall the specifics of them.
Q. Did you sit down and go through the elements — what we call the elements of the law in those offenses?
*204 A. Yes, I did.
Q. Okay. So you’ve taken that in your [sic] account in your ultimate assessment? A. Yes.
Q. You told us that you looked at the medical records that Airman Clark had maintained on him over at the hospital correct?
A. Right.
Q. Do those include prior mental health records?
A. No. He did not have any.
Q. Had none? My next few questions come from a vantage point of ignorance, I’m afraid. The only person who has seen the full sanity board report is Captain Johnson [the defense counsel], Airman Clark, of course and I assume you have seen it. We haven’t seen it so some of my questions may be a little off cue, because I don’t know what’s in the thing.
A. Okay.
Q. Apparently Colonel Marrero rendered a diagnosis during the course of that report, is that right?
A. She said rule out — she would rule out several diagnoses. She didn’t pin point anything.
Q. Okay. Did Colonel Marrero reference within the report any statements made by Airman Clark?
A. Yes, she did.
Q. Did you read those?
A. Yes.
Q. So you’re [sic] overall assessment is based on the following: your inpatient contact with Airman Clark 30 [sic] through 6 June?
A. Right.
Q. You reviewed Colonel Marrero’s assessment in the sanity board report to include both narrative and certain statements attributed to Airman Clark?
A. Right.
Q. You took a look at the charge sheet and reviewed what we call elements of the law?
A. Uh-huh. Right.
Q. Affirmative response. And you reviewed the DSM-IV is that correct?
A. That’s correct.
Q. Aside from your own professional experience, anything else brought to bear upon your ultimate opinion?
A. No. No, Sir.
Emphasis added.
The military judge ruled that after Dr. Peterson’s testimony, M.R.E. 302 no longer barred the testimony of Dr. Marrero as to either Dr. Marrero’s opinions or the statements of Appellant made during Dr. Marrero’s examination.
“Ordered Under R.C.M. 706”
M.R.E. 302 is designed to ensure Fifth Amendment protections when “the accused” is “ordered under R.C.M. 706” to submit to a Government psychiatrist.[1] In this case, the examination the defense would like to exclude was one requested by the trial defense team and returned only to that team. This was not the type of examination contemplated by M.R.E. 302. R.C.M. 706 permits the Government to order a psychiatric examination of an accused, an examination to which the accused must submit if he or she wishes to introduce expert testimony in support of an insanity defense. Once the defense of lack of mental responsibility is raised by the defense, M.R.E. 302 allows testimony or other evidence regarding the conclusions of the R.C.M. 706 examination, but generally excludes statements made by the accused.
In this case, because the defense was dissatisfied with the results of its essentially “private” R.C.M. 706 board, it called Dr. Peterson, Appellant’s treating psychiatrist, to testify. She reviewed the full report of Dr. Marrero’s R.C.M. 706 board before testifying.
*205 In 1987, the Supreme Court addressed this dilemma:
[I]f a defendant requests such [a psychiatric] evaluation or presents psychiatric evidence, then at the very least, the prosecution may rebut this presentation with evidence from reports of the examination that the defendant requested. The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution.
Buchanan v. Kentucky, 483 U.S. 402, 422-23, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987).
“Derivative” Evidence
M.R.E. 302 does not apply when the defense introduces evidence “derivative” of the sanity board. “Derivative” is defined as “a word formed from derivation.” A secondary meaning is “something derived.” “Derived” is defined as “to take or receive esp. from a specified source.” Webster’s New Collegiate Dictionary 342 (1983). As indicated, derived means “receive from.” Major (Dr.) Karen Peterson’s testimony was, at least to some colorable degree, “received from” or “deduced from” Colonel (Dr.) Gregoria Marrero and the statements that Appellant had made to Colonel Marrero. Once Dr. Peterson testified, Dr. Marrero was permitted to testify as to both her findings and Appellant’s statements.
The majority holds that, even if the defense perverts the mechanism of R.C.M. 706 to receive an essentially private psychiatric examination, uncontemplated by the drafters, the results of which the defense does not like, then both the results of that examination and Appellant’s statements would remain privileged under a rule intended to protect statements made in the course of a compliant R.C.M. 706 inquiry. This result, the majority reasons, is compelled by a plain reading of both rules, notwithstanding subsequent use of both those results and statements by a second defense expert who is called to testify to contrary conclusions after a second examination. In answer to the majority’s query,[2]1 must posit a corollary: If the rules were as the majority proposes, what defense counsel would not be per se ineffective in failing to request such an R.C.M. 706 inquiry?
The same scenario in this case was presented to Judge Weinstein in United States ex rel. Edney v. Smith, 425 F.Supp. 1038 (E.D.N.Y.1976) aff'd without opinion, 556 F.2d 556 (2d Cir.), cert. denied, 431 U.S. 958, 97 S.Ct. 2683, 53 L.Ed.2d 276 (1977). Edney, at his trial, raised the insanity defense and called a psychiatric expert to testify on his behalf. The court permitted the prosecution to call in rebuttal the psychiatrist who originally examined the defendant at counsel’s request for the purpose of trial preparation. This psychiatrist testified for the Government that Edney did not suffer any mental disease or defect and appreciated the nature of his acts. Judge Weinstein delivered a lengthy and careful decision and concluded that although the psychiatric testimony may have been privileged, the defendant waived any attorney-client privilege by offering the expert testimony on the insanity defense. A number of other courts have done likewise, including the Supreme Court of Washington in State v. Pawlyk, 115 Wash.2d 457, 800 P.2d 338, 350 (1990); see also Pawlyk v. Wood, 248 F.3d 815 (9th Cir.2001).
Insanity Defense
A third exception is M.R.E. 302(c), which recognizes that the defense waived the privilege under M.R.E. 302 by presenting testimony from Dr. Peterson. Once the “defense offers expert testimony concerning the mental condition of the accused, the military judge ... shall order the release to the prosecution of the full contents ... of any report prepared pursuant to R.C.M. 706.” Thus, the privilege under M.R.E. 302(a) did not extend to the testimony of Dr. Marerro when the defense first called Dr. Peterson to the stand, and used her findings and conclusions resulting from a psychiatrist examination of the defendant to show lack of mental responsibility.
M.R.E. 302 protects direct communications with the expert. Generally, consulting with the expert does not create an opposing witness. But when an attorney asks an expert to examine his client to gain the expert’s *206 opinion, that opinion will be privileged except when the defense seeks to employ that report to improve the opinion of another expert and to prevent any counter arguments. The opinions of both experts do not rely totally on statements from the accused but include other information from other sources, including witnesses as to the specific facts. While the first expert’s opinion is privileged, the opinion is only partially related to the accused’s communication. But even those communications that are privileged, either under the Fifth Amendment or the attorney-client privilege, are waived when there is a derivative use of the first expert’s report as in this case. M.R.E. 302. Cf. United States v. Olivero, 39 M.J. 246 (C.M.A.1994) (failing to catalog or seal the statements resulted in the inference of derivative use, allowing the inference that the witness’s statements were obtained prior to the immunized statements, whether or not it was seen or relied upon). See also United States v. Mapes, 59 M.J. 60 (C.A.A.F.2003) (timing by itself was enough to show derivative use). A member of the prosecution may not, in the first instance, interview or call the expert from the first sanity board. But M.R.E. 302 does not render the first expert completely incompetent to testify. If that testimony is contrary to the defense position, it should not allow the defense to continue shopping around until it finds an opinion to its liking. To expand the Fifth Amendment and the attorney-client privilege to exclude the first expert’s opinion when the defense has the second expert examine that report deprives the trier of fact of the benefit of valuable expert advice. Edney, 425 F.Supp. 1038; Pouncy v. State, 353 So.2d 640, 642 (Fla.Dist.Ct.App.1977); State v. Carter, 641 S.W.2d 54, 58 (Mo.1982). The defense should not be allowed to bury the witness or corner the market on expert witnesses. Cf. United States v. Warner, 62 M.J. 114 (C.A.A.F.2005)(requiring comparable witnesses for defense). The fact that the statements of the accused were elicited by Dr. Marrero does not mean they are always privileged if the defense seeks to admit these same statements through Dr. Peterson. But as mentioned, Dr. Marrero’s opinion does not rely solely on the accused’s statements but also on case-specific facts and third-party descriptions of the accused’s behavior and reactions on particular occasions.
In this case, the prosecution did not seek to admit the accused’s statement to Dr. Marrero, but to obtain the conclusions from that expert, which are based on case-specific facts. This is permissible when there has been derivative use of her opinion and report. Thus, Dr. Marrero should be able to give her opinion, which is based on observations of the accused, third parties’ descriptions of the accused’s behavior, and other facts surrounding the conduct. Wfiiat the majority seeks to do is transform the privilege under M.R.E. 302 unto a broad rule of incompetency that undermines the truthfulness of a criminal trial. The result is to unnecessarily expand the privilege. For these reasons, I respectfully dissent.

. One can parse the language from R.C.M. 706(a) to support a number of positions. The R. C.M. 706 evaluation in this case was not one contemplated by the drafters. It was requested by the defense, and-returned to the defense, but not to the commander or convening authority. Any defense counsel would like any number of these types of evaluations until they get the one they desired.

. 62 M.J. at 198 n. 14.